## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MICHAEL KURILLA,

    *Plaintiff*,

*v.*

COMISSIONER OF SOCIAL SECURITY,

   *Defendant*.

_____/

     CASE NO. 17-cv-11592

     DISTRICT JUDGE DAVID M. LAWSON

     MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON CROSS MOTIONS
## FOR SUMMARY JUDGMENT (Docs. 13, 14)

## I. REPORT

### A. Introduction and Procedural History

   This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Michael Kurilla's claim for disability benefits under the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. (Doc. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 4). The matter is currently before the court on cross-motions for summary judgment. (Docs. 13, 14).

   Plaintiff was born on August 20, 1955, making him 58 years old on his alleged onset date of April 15, 2014. (Doc. 13 at ID 442–43). His date last insured was December 31, 2018. (*Id.* at ID 443). He filed his application for DIB on May 1, 2014.[1] (Tr. 142). His

_____

[1] The ALJ's opinion describes Plaintiff as filing on April 30, 2014.

application was denied on October 7, 2014, (Tr. 70–85, 88–92), and Plaintiff filed a timely Request for Hearing on October 22, 2014. (Tr. 98–99). The hearing was held on February 9, 2016, before Administrative Law Judge ("ALJ") Amy L. Rosenberg; Plaintiff and Vocational Expert ("VE") Kenneth Browdy both testified at the hearing. (Tr. 31–69). On March 28, 2016, the ALJ issued a decision denying Plaintiff's claim. (Tr. 16–30). Plaintiff submitted a request for review to the Appeals Council, (Tr. 8–15), along with some additional evidence, (Tr. 394–95).[2] The Appeals Council denied his request on March 23, 2017. (Tr. 1–5). This action followed.

## B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

---

[2] In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, any "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision—the final decision of the Commissioner—the court can consider only evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (internal citations omitted).

## C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity ["RFC"] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459

4

F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ concluded that Plaintiff had not been disabled under the Act between his alleged onset date of April 15, 2014, and the date of the decision, March 28, 2016. (Tr. 16–27). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 21). At step two, she determined that Plaintiff had the following severe impairments: degenerative disc disease of the lumbosacral spine; a history of cervical spine discectomy and fusion; carpal tunnel syndrome in both hands, post-left carpal tunnel release; moderate mixed hearing loss bilaterally; coronary artery disease; osteoarthritis of the left knee; carpometacarpal ("CMC") joint arthritis in both thumbs; and stenosing tenosynovitis ("trigger finger") in multiple digits. (*Id.*). Moving on to step three, she decided Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 22). The ALJ's step four evaluation culminated in her finding that Plaintiff had the residual functional capacity

> to perform light work as defined in 20 CFR 404.1567(b) with the following specific limitations: he can lift up to 20 pounds occasionally and 10 pounds frequently; can sit up to 6 hours in an 8-hour workday, but is limited to standing and walking for 2 hours in an 8-hr workday; he can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; he can occasionally handle, finger, and feel; he should have no concentrated

5

exposure to extreme cold or extreme heat; and he is limited to working at a moderate noise level, at most.

(*Id.*). With that RFC, Plaintiff was capable of performing past relevant work as product manager research and development, and thus at step four the ALJ found Plaintiff had not been under a disability and she did not proceed to step five. (Tr. 26–27).

## E. Administrative Record

### 1. Medical Evidence

The court has thoroughly reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the court will make reference and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2. Application Reports and Administrative Hearing

#### a. Plaintiff's Function Report

Plaintiff completed a function report on July 1, 2014. (Tr. 182–89).   Plaintiff complained that his conditions—"severe" back and neck pain, hearing loss, fatigue, and neck fusion—limited his functioning every day. (Tr. 182). Before the onset of his conditions, he was able to ski, Jet Ski, power boat, drive long distances, play with his grandchildren, lift and carry objects, and hear. (Tr. 183). Now, his neck fusion limited his movement and troubled his sleep. (Tr. 182). Due to his hearing loss, he could not "hear in any situation that requires more tha[n] 2 people in discussions." (*Id.*). His hands would sometimes go "numb up [to] my elbows." (*Id.*). Further, his heart defect limited his daily activities by making him feel tired and weak. (*Id.*).

Plaintiff indicated that he lived in a house with his wife. (Tr. 36, 182).His daily routine consisted of showering and shaving, taking his medication and using heat pads on his neck, eating breakfast, watching the news, using the computer, and eating lunch. (Tr. 183). After lunch he would let the dogs outside, rest for an hour or two, and then make and eat dinner. (*Id.*). He would finish his day by watching TV, taking medication and applying heat pads once more, and finally going to bed. (*Id.*).

He complained that his sleep suffered because his neck pain woke him up several times per night, his hands went numb or hurt, and his pain medication kept him up "all night." (*Id.*). Buttoning his clothes was difficult, as was lifting his legs to put on pants. (*Id.*). He was able to shower but had trouble getting in the bathtub. (*Id.*). While he reported that the conditions affecting his hands also affected his ability to use the toilet, he had no issue with caring for his hair, shaving, or feeding himself. (*Id.*).

Every day he prepared his own meals, taking between fifteen minutes and one hour to make foods such as toast, blended fruit, cereal, and "simple" lunches and dinners. (Tr. 184). He also went outside daily by walking, driving, or riding in a car, and he was able to go out alone. (Tr. 185). At home, he did chores including laundry, mowing a small yard, cleaning, sweeping, and window washing, although it took him "much longer" than it used to. (Tr. 184). Additionally, he took care of his dogs by feeding them and taking them out to relieve themselves, to the veterinarian and groomer, and for short walks. (Tr. 183). Once a week, he spent about an hour shopping for food, and once every three to four months he spent an hour or two shopping for clothes in stores or by computer. (Tr. 185).

As for hobbies, he enjoyed watching TV every day and boating once a week during the summer. (Tr. 186). Since the onset of his conditions, he had sold his power boats and kept only a pontoon boat "to protect my neck and back, per doctor's direction." (*Id.*). Once a week he went out and had dinner with others, although he also he reported that his conditions had caused him problems getting along with other people. (Tr. 187–88). He found himself more irritable, and said that his medication affected his attention, and his hearing loss could be an obstacle to his hearing or understanding conversations. (Tr. 188). He got along "O.K." with authority figures. (*Id.*).

Asked which activities his conditions affected, Plaintiff marked the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, memory, completing tasks, concentration, understanding, using hands, and getting along with others. (Tr. 187). Some of these he explained further: he was not able to lift as much weight since onset, squatting hurt his knees, bending hurt his back and neck, standing hurt his back and knee, reaching was difficult due to weakness in his hands and arms, and he struggled to hear a conversation without his hearing aids or in a large crowd. (*Id.*).

According to Plaintiff's estimates, he could walk one to two blocks before needing to rest for ten to thirty minutes, depending on the day. (*Id.*). He could pay attention for ten to fifteen minutes at a time and could not finish what he started. (*Id.*). He handled stress "not well" and was able to "accept little changes" in routine. (Tr. 188).

He wore hearing aids at all times; he also took the medication hydrocodone/acetaminophen, which had the side effect of causing him issues with sleeping and attention. (Tr. 189).

### b. Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified at the administrative hearing held before ALJ Amy Rosenberg on February 9, 2016. (Tr. 31–56). Plaintiff began by explaining that he had completed high school, as well as some community college. (Tr. 37). In the past fifteen years, he had worked several jobs in the defense and automotive engineering industries; he had stopped working sometime in late 2013 "because of all the . . . health issues [he]'d been having." (Tr. 38).

He first described his work as an operations manager for Carron Industries, an automotive engineering supply company. (*Id.*). His daily work there was "a combination of office work and being out on the manufacturing floor." (Tr. 39). At times he lifted objects weighing more than fifty pounds, but he could not pinpoint a proportion of time he was required to do so, because "it's all based on a particular project that we were working on." (*Id.*).

After that, he worked for Ceradyne, Inc., where he started as a program manager, and his responsibility was to "support[] vehicle programs for Ford Motor Company," specifically "survivability programs, . . . armored vehicles for non-military application. (Tr. 40). Day to day, he "worked with the engineering group to design and manufacture armor materials that went into the vehicle." (*Id.*). There, as well, his duties involved a combination of "work done in the office and work done out in the shop environment on the vehicles."

9

(Tr. 41). That work required him to lift "pretty substantial" armor panels that he estimated weighted more than fifty pounds. (*Id.*).

Eventually, he became an operations director for Ceradyne, Inc., where he oversaw a facility that produced product for the U.S. military. (*Id.*). He described his position as involving the "same job tasks" as when he was a program manager, but with "more responsibility." (*Id.*).

Starting in 2007, Plaintiff moved to a sales director position at Agis Blast Protection, another defense company that provided survivability materials for military use. (Tr. 42). His daily responsibilities included reaching out to potential customers and traveling to sell the company's products about fifty to sixty percent of the time, both within the continental U.S. and overseas. (*Id.*). When he traveled, he had to lift and carry his luggage and armor materials in a sample case. (Tr. 42–43). He estimated the sample case was kept to "around [fifty] pounds to make it air-worthy." (*Id.*).

In 2008, he moved to Foster Miller, Inc., another defense company providing survivability materials and equipment for both military use and commercial applications. (Tr. 43). He started there as a business development manager and ended as a senior business development manager. (*Id.*). His duties were similar to his previous job, namely traveling with samples both locally and internationally to customer sites. (*Id.*).

From 2009 to 2012, he worked at Ven Core, and served in positions for Honeywell, Livernois Vehicle, and a company the name of which he was unable to recall. (Tr. 44). At Honeywell, he was a survivability development manager, similar to his previous positions. (Tr. 44–45). At Livernois Vehicle, "they were doing commercial vehicle programs for

10

Chrysler and Ford"; his job required him meet customers and sell programs, and to help direct and manage the programs after sale. (Tr. 45).

Finally, he had worked at Cortech, LLC, which Plaintiff explained was also part of the Honeywell Group. (*Id.*). Plaintiff said he had looked for other work when he felt he was no longer able to perform his previous jobs, but he felt he was limited by his previous experience and was unable to find work he could perform. (Tr. 48).

Next, Plaintiff described what was preventing him from working on a full-time, sustained basis. (Tr. 46). He explained that he had had a lifelong "pretty severe disability" with his hearing and that as of 2011, he had been seeing a specialist for his ears for about 45 years. (*Id.*). As his ears "tend[ed] to shift and move and the prosthesis that they put in the ears change[d]," every few years he underwent surgery in an attempt to correct the changes. (*Id.*). In 2009, Dr. Dennis Bojrab performed surgery on his right ear in an attempt to correct his hearing loss, during which Plaintiff suffered a ruptured C4-C5 vertebra in his neck. (Tr. 46–47).

Post-surgery, Plaintiff "struggled for probably six, eight months on pain medication to the point that I met and consulted with a spinal surgeon who did a fusion on my neck" around April of 2010. (Tr. 47). After this surgery, he was not sent to physical therapy because he had "a tear" in his left shoulder. (*Id.*). Despite another surgery, he continued to have "severe limitations with being able to turn [his] neck." (*Id.*). His surgeon advised him that he "had to live with the situation and go through pain management," which he "attempted to do." (*Id.*).

11

The latter surgery also resulted in numbness in his arms, which was later diagnosed as bilateral carpal tunnel syndrome. (*Id.*). In 2014, he underwent surgery on his left hand to treat his carpal tunnel syndrome as well as trigger finger in his index finger. (Tr. 47–48). Although he praised the surgeon for doing "a stellar job," his hand "still ha[d] numbness in it" and trigger finger had since developed in his other fingers, excluding his index finger. (Tr. 49) Additionally, he complained of basal joint arthritis. (*Id.*). He described his hands as "basically gone." (*Id.*).

He also mentioned having "a L5-L6 herniated disc problem that cause[d] a bad sciatica" in his right leg, (Tr. 47), and having surgery on his left knee for a tear in his meniscus, "which made it very difficult . . . to get in and out of vehicles and to travel long durations in a vehicle or a plane." (Tr. 47-48).

Additionally, around 2001 or 2002, he saw a general practitioner for "severe chest pain and breathing difficulty" and was diagnosed with "a breathing issue," for which was given medication and respirators. (Tr. 52). In 2003 or 2004, he was put in intensive care and met with a cardiologist, Dr. Zaks, after his "heart condition was critical" during an ear surgery. (*Id.*). In February 2006, it was determined he needed a stent. (Tr. 53). He relayed that his cardiologist described his heart as "abnormal," as he had "two ventricles where most people only have one." (*Id.*).

Further, he had been recently diagnosed with a blood disorder called MGUS. Dr. Zaks, had warned him that a stressful environment could negatively affect his health, and Plaintiff reported that he experienced dizzy spells after "[a]ny lifting or bending." (*Id.*).

12

He took prescription medication for hypertension, high cholesterol, and nitroglycerin. (*Id.*). His heart and pain medications put his liver at risk. (*Id.*). The Vicodin gave him trouble sleeping, as well as "pretty severe headaches" one or two times a week that could last anywhere from twenty minutes to a full day. (Tr. 55). In combination with other medications he was taking, it also caused him "severe intestinal problems." (*Id.*).

Plaintiff testified that he lived in a house with his wife. (Tr. 36). He was able to do "mild tasks" around the house, although his "big problem[]" was that his basal joint arthritis limited his ability to use his thumbs. (Tr. 48-49). He did not write using a pen or a pencil, and used the computer "sparingly," using one finger to type. (Tr. 49). Buttons on clothing posed a problem for him, so he wore "a lot of pull-overs and clothes that I can slide into." (*Id.*). Further, in "a typical day," the intermittent numbness in his hands sometimes caused him to drop and break things. (Tr. 50). He was able to lift his arms but did not usually lift his arms above shoulder height, except to get a dish or cup from his cupboards. (*Id.*). He estimated that he could sit or stand comfortably for about twenty or thirty minutes at a time before having to change position due to pain. (Tr. 54). Asked how much weight he could lift and carry comfortably, he said five to ten pounds. (Tr. 55–56). Although his "severe limitations with being able to turn [his] neck" made driving difficult, he continued to drive. (Tr. 37, 47).

He found some relief in using a hot pad on his neck to loosen the muscles in the morning, as well as pain cream and Vicodin, although he reported he could not sleep after taking the Vicodin. (Tr. 50–51). His middle ear was "all prosthesis, sometimes . . . donor materials" and sometimes material developed by his doctor. (Tr. 51). He had tried "three

or four experimental hearing prosthesis, which is a combination of something they put in the ear and something . . . external." (*Id.*). He typically wore a device in his right ear when around multiple people so he could better follow the conversation; none of the hearing devices he tried in his left ear had worked. (*Id.*). Unfortunately, the hearing aid tended to pick up sounds from behind him rather than in front of him, which rendered it ineffective in noisier environments. (*Id.*).

### c. The Vocational Expert's Testimony at the Administrative Hearing

VE Kenneth Browdy also testified. (Tr. 56). To start, he classified Plaintiff's past employment as the following: manager, business development (skilled, usually performed as sedentary, Plaintiff performed as medium); manager, product manager, R&D (skilled, usually performed as sedentary, Plaintiff performed as heavy); and operations manager (skilled, usually performed as light, Plaintiff performed as heavy). (Tr. 57–58). The ALJ then posed his first hypothetical:

> [A]ssume a hypothetical individual of the claimant's age, education and the past work experience you described. . . . [A]ssume the person is limited to work at the light exertional level as that is defined in the Social Security Regulations; the person should only occasionally climb ramps and stairs; should never climb ladders, ropes or scaffolds; the person can occasionally balance, stoop, kneel, crouch or crawl; handling, fingering and feeling bilaterally would all be limited to frequent, not constant; the person should have no concentrated exposure to extreme cold or extreme heat; and should work at a moderate noise level at most, could this hypothetical individual perform the past jobs you described either as actually or generally performed?

(Tr. 58). The VE answered that such a person could perform the past jobs as generally performed, but not as Plaintiff had actually performed them. (*Id.*).

The ALJ moved on to his next hypothetical, building from the first: "If we limited the person's standing and walking to two hours per day, keeping the weight levels at the light exertional level as far as 20 pounds occasionally, 10 frequently, but the person could only stand or walk two hours per day, would any of those past jobs be available?" (*Id.*). The past jobs of business development manager and R&D product manager would be available as generally performed; operations manager would not. (Tr. 59). None of the three jobs would be available as Plaintiff had actually performed them. (*Id.*).

Next, the ALJ kept handling and feeling at frequent, but changed fingering to occasional. (Tr. 59). According to the VE, all three positions would remain available as generally performed and unavailable as Plaintiff had actually performed them. (Tr. 59–60).

When the ALJ inquired how changing handling to occasional would affect the analysis, the VE confirmed that R&D product manager would still be available as generally performed, with or without the second hypothetical's limitation on standing and walking. (Tr. 61–62). Operations manager, as generally performed, would remain available under hypothetical one and unavailable under hypothetical two. (Tr. 61). Business development manager would not be available as generally performed. (*Id.*).

The VE then explained that if the exertional level was sedentary, R&D product manager and business development manager would still be available as generally performed. (Tr. 59). Next, the VE testified that an added limitation allowing the person to change position between sitting and standing every thirty minutes would not affect her answers to the earlier hypotheticals. (Tr. 62).

The ALJ inquired whether the VE's answers would change if "the person were going to need additional breaks beyond regularly scheduled rest breaks and as a result would be off task 20% of the day on most workdays." (*Id.*). The VE answered that such a limitation would be work preclusive for all work, including Plaintiff's past work. She clarified that "[t]his is a value not covered by the DOT [Dictionary of Occupational Titles] or the SCO [Selected Characteristics of Occupations]," so she had answered according to her "vocational judgment on that as well as other parameters based on my 30+ years' experience as a vocational professional and observation of these jobs." (*Id.*). Otherwise, her testimony had been consistent with the DOT. (Tr. 62–63).

For his part, Plaintiff asked whether an average of one absence a week would be work preclusive. (Tr. 63). The VE answered that it would be. (*Id.*). Plaintiff then asked whether restricting noise exposure to less than moderate would affect the VE's answers. (Tr. 64). The VE answered that that noise restriction would eliminate business development manager and R&D product manager. (Tr. 64–65). Upon later questioning from the ALJ, the VE also clarified that while Plaintiff had transferable skills, no jobs to which those skills pertained would be available with a restriction of less than moderate noise. (Tr. 66). If handling and fingering were restricted to occasional, sedentary employment would still be available as a surveillance system monitor—that job, however, would not be a job to which Plaintiff's skills would transfer. (Tr. 67–68). Further, if handling and fingering were restricted to less than occasional—in other words, never—none of Plaintiff's previous work would be available as performed or as described in the DOT. (Tr. 65–66).

**F. Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

17

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). The ALJ must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

18

must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists; the ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*,

19

39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

A claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment." 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "[O]bjective evidence of the pain itself" is not required. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)     [D]aily activities;
    (ii)    The location, duration, frequency, and intensity of . . . pain;
    (iii)   Precipitating and aggravating factors;
    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
    (v)    Treatment, other than medication, . . . received for relief of . . . pain;
    (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G. Analysis

Plaintiff challenges the ALJ's decision on two grounds: (1) that the ALJ erred in evaluating Plaintiff's credibility, and (2) that the ALJ's RFC determination was not supported by substantial evidence. (Doc. 13).

### 1. The ALJ did not err in her credibility determination for Plaintiff.

Plaintiff first takes issue with the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible." (Tr. 23). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

Plaintiff first argues that the ALJ's opinion was based entirely in boilerplate language and lacked specific reasons for her finding on credibility. (Doc. 13 at ID 451).

Almost immediately thereafter, however, Plaintiff seems to acknowledge that the ALJ did enumerate specific reasons; he then accuses the ALJ of basing her credibility determination on "cherry-picked incidents in the record." (Doc. 13 at ID 451). But "the same process can be described more neutrally as weighing the evidence." *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009); *see also Delong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (An allegation of "'cherry picking' the record . . . is seldom successful because crediting it would require the court to re-weigh record evidence."). And it is not for this Court to reweigh the evidence. *Albanna v. Comm'r of Soc. Sec.*, No 15-14264, 2016 WL 7238925, at *1, *12 (E.D. Mich. Nov. 22, 2016) ("Arguments which in actuality require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual.") (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)). The court must affirm the Commissioner's decision if it was supported by substantial evidence—even if substantial evidence also supports a different conclusion. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

In making a credibility determination for Plaintiff, the ALJ considered record evidence including Plaintiff's treatment records and self-reported daily activities. (Tr. 25–26). The ALJ observed that "[i]n the treatment records from Providence through 2015, the claimant generally had normal examinations with no significant complications or problems [with] his health." (Tr. 25) (citing Tr. 308–11, 316–29, 381–83, 384–88). The treatment records from Heart Cardiology Consultants revealed that during the office visits in April 2013, January 2014, and July 2014, Plaintiff had normal neck condition and normal cardiovascular examinations with regular rate, normal heart sounds, and no murmurs. (Tr.

26) (citing Tr. 286–89, 269–73, 258–62). Plaintiff's visits in November 2014, May 2015, and September 2015 were similarly unremarkable. (Tr. 26) (citing Tr. 389–93, 384–88, 370–77).

In April 2014, Plaintiff underwent surgery for carpal tunnel and index trigger release on his left hand. (Tr. 301-02). As soon as thirteen days after surgery, he reported that the numbness in his left hand was gone. (Tr. 303). In June 2014, again, his treating physician's notes confirmed that the carpal tunnel release surgery had worked. (Tr. 300). And still in September 2015, Plaintiff was reporting that "his left hand was no longer numb; the carpal tunnel release surgery worked." (Tr. 26). Plaintiff decided to postpone the same surgery on his right hand—his dominant hand, (Tr. 204)—until after a months-long trip to Florida. (Tr. 26). *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."). Plaintiff testified at his hearing that the surgeon "did a stellar job," but his left hand "still has numbness in it." (Tr. 49).

The ALJ also considered Plaintiff's daily activities in determining his credibility. (Tr. 26). *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("As a matter of law, an ALJ may consider household and social activities in evaluating complaints of disabling pain."). Plaintiff regularly went out to dinner and socialized with others. (Tr. 187–88). He still enjoyed going boating on his pontoon boat every week in the summer. (Tr. 186). He left the house every day on a walk or drive or by riding in a car, and

was able to go out alone. (Tr. 185). He was able to prepare simple meals and perform household chores—even if they took him longer than they had before—including cleaning, sweeping, window washing, laundry, and mowing the lawn. (Tr. 184).

Plaintiff asserts that the ALJ's analysis of his function report "is misleading"—for example, he says, the ALJ "failed to acknowledge that even though the Plaintiff takes care of animals, his wife helps him." (Doc. 14 at ID 450). Further, he accuses the ALJ of ignoring that Plaintiff's neck pain sometimes woke him up, he had difficulty buttoning his clothes, he only prepared simple meals, and that overall it took him "much longer" to perform chores than it used to. (*Id.* at ID 450).

But the ALJ explicitly described Plaintiff as able to prepare "simple" meals. (Tr. 26). And the ALJ noted that Plaintiff's function report reflected that he "had trouble with using his hands, including doing buttons." (Tr. 26). The ALJ also noted, however, that as of September 2014, Plaintiff could in fact button his clothes. (Tr. 24). So too could he tie his shoes, dial a telephone, open a door, make a fist, pick up small objects like a coin and a pencil, and write. (Tr. 293). He was also able to sit, stand, bend, stoop, carry, push, and pull; his only difficulty appeared to be in squatting and rising from squatting. (*Id.* at 293). And in October 2014, the state agency physician observed no functional limitation of Plaintiff's hand grip or dexterity. (Tr. 82).

As for Plaintiff's assertion that his wife helps him take care of his pets, Plaintiff's own function report reflects that he was able to care for his animals by feeding them, taking them out, taking them to the vet and groomer, and taking them on short walks. (Tr. 183).

24

And his function report suggests that while his wife took on the same tasks, each executed his or her responsibilities independent of the other. (*Id.*).

At bottom, it appears that if Plaintiff had his way, the ALJ would "cherry-pick" only favorable facts from the record. But it is irrelevant whether substantial evidence supports a different decision from the ALJ's, so long as substantial evidence also supports the ALJ's opinion. If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286. For the reasons discussed above, I suggest that not only has Plaintiff failed to present a compelling reason to disturb the ALJ's credibility assessment, but substantial evidence supports the ALJ's credibility determination for Plaintiff.

### 2. The ALJ's assessment of Plaintiff's residual functional capacity was supported by substantial evidence.

Next, Plaintiff argues that the ALJ's RFC determination[3] that Plaintiff could occasionally[4] handle, finger, and feel with both hands was not supported by substantial evidence. (Doc. 13 at ID 453); (Tr. 22). Again, if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the

---

[3] Plaintiff initially states that the ALJ made "an erroneous *Step Five* determination." (Doc. 13 at ID 452) (emphasis added). But the ALJ's analysis ended at Step Four, when she found Plaintiff capable of performing past relevant work. (Tr. 26). The remainder of Plaintiff's brief makes clear that his issue is with the ALJ's RFC determination immediately before Step Four—specifically, the ALJ's finding that Plaintiff could occasionally handle, finger, and feel with both hands. (citing Tr. 22). To any extent that Plaintiff did intend to argue that the ALJ made an erroneous Step Five determination, I suggest Plaintiff's argument should be rejected because the ALJ made no such determination.

[4] Plaintiff initially describes the ALJ as having found that Plaintiff could "frequently" handle, finger, and feel, but later corrects himself to "occasionally." (Doc. 13 at 453-54); (Tr. 21).

matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286 (6th Cir. 1994).

To make his point, Plaintiff presents the treatment records of an impairment affecting his hands. He first draws the Court's attention to a June 2013 EMG showing delayed median sensory distal latencies bilaterally, suggesting median nerve entrapment such as carpal tunnel syndrome, and denervation in the left median nerve distribution. (Tr. 214–16). Next, he points to a July 2013 appointment in which Dr. Martin Jenter diagnosed Plaintiff with bilateral carpal tunnel syndrome—although at the same appointment, Plaintiff reported that his symptoms had lessened, and he believed wearing wrist braces at night was helping. (Tr. 256).

Then, in April 2014, Plaintiff underwent carpal tunnel release and index finger release surgeries on his left hand. (Tr. 301). Post-surgery, Dr. Jean-Paul Guiboux noted Plaintiff's left hand was now negative for Tinel's sign, while his right hand continued to test positive. (Tr. 299). He also reported Plaintiff had bilateral positive CMC grind, tenderness at multiple A1 pulleys, and "moderate CMC arthroplasty at the base of the thumbs." (Tr. 299).

The ALJ did recognize that Plaintiff had several severe impairments that would affect the use of his hands, and thus limited him to only occasional handling, fingering, and feeling. (Tr. 21–22). The ALJ's RFC assessment was supported by much the same evidence recounted in discussion of the previous issue: namely, Plaintiff's daily activities that included performing household chores, driving, and boating, (Tr. 26); that Plaintiff repeatedly reported his left carpal tunnel release surgery had been successful, (Tr. 299, 300,

302); that he then delayed surgery on his dominant right hand for a vacation, (Tr. 204, 299); that in October 2014, the state agency physician observed no functional limitation of his hand grip or dexterity, (Tr. 82); and that in September 2014, Plaintiff could perform tasks requiring manual dexterity including buttoning his clothes. (Tr. 291–93).

At his February 2016 hearing, Plaintiff testified that he still experienced numbness in his left hand. (Tr. 49). He also spoke of difficulty with buttons on his clothing and with grasping objects, to the extent that he dropped or broke things on most days. (Tr. 49–54). However, as described above, the ALJ made a supportable determination finding Plaintiff's testimony regarding his symptoms "not entirely credible." (Tr. 23).

As a final matter, I note that Plaintiff also briefly recounts the rule that "the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence." (Doc. 13 at ID 451) (citing SSR 96-7p). Even if the court were to extrapolate an argument from Plaintiff's mere mention of the rule, I suggest such an argument would be unavailing. To the extent that the ALJ disregarded Plaintiff's subjective complaints, she did so not "simply because they lack[ed] substantiating objective evidence," but for the multitude of reasons explored above.

Thus, though Plaintiff has presented some evidence of limitations related to his hands, he has failed to show that the ALJ did not adequately account for his impairments by limiting him to occasional handling, fingering, and feeling. For the reasons recounted above and in the previous section, I therefore suggest the Court find the ALJ's decision was supported by substantial evidence.

## II.   RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 13), be **DENIED**, the Commissioner's Motion for Summary Judgment, (Doc. 14), be **GRANTED**, and this case be **DISMISSED**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response

must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  February 26, 2018                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: February 26, 2018                     By s/Kristen Castaneda
                                            Case Manager